UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,**<br><br>PLAINTIFF,<br><br>V.<br><br>**DEUTSCHE BANK AG,**<br><br>DEFENDANT. | **NO. 1:16-CV-6544**<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF** |

Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I.  SUMMARY

1. On April 16, 2016, the swap data reporting system at Deutsche Bank AG ("Deutsche Bank" or "Defendant") experienced an outage that prevented Deutsche Bank from reporting any swap data for multiple asset classes for approximately five days (the "System Outage"). Deutsche Bank's subsequent efforts to end the System Outage repeatedly exacerbated existing reporting problems and often led to the discovery or creation of new reporting problems, many of which violate a previous CFTC Order. A number of these reporting problems persist today, affecting market data that is made available to the public, as well as data that is used by the Commission to evaluate systemic risk throughout the swaps markets. The System Outage and the subsequent reporting problems transpired at least in part because Deutsche Bank failed to have an adequate Business Continuity and Disaster Recovery Plan and other appropriate supervisory systems in place.

2. By virtue of this conduct and the further conduct described herein, Deutsche Bank has engaged, is engaging, or is about to engage in acts and practices in violation of a CFTC

1

Order; 7 U.S.C. §§ 2(a)(13)(F) and (G) (2012); and 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii), 45.4(a), (c)(1)(i) and (c)(2)(i), 45.6, 45.14(a), 23.602, and 23.603 (2016).

3. Accordingly, pursuant to 7 U.S.C. § 13a-1 (2012), the Commission brings this action to permanently enjoin Defendant's unlawful acts and practices and to compel their compliance with the CFTC Order, the Commodity Exchange Act (the "Act"), 7 U.S.C. § 1 *et seq*. (2012) and the Commission Regulations ("Regulations"), 17 C.F.R. § 1.1 *et seq*. (2016). In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, the immediate appointment of a monitor, as well as any other such relief as the Court may deem necessary and appropriate.

4. Unless restrained and enjoined by this Court, Deutsche Bank is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     JURISDICTION AND VENUE

5. 7 U.S.C. § 13a-l(a) authorizes the Commission to seek injunctive relief in district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, Regulation, or order thereunder.

6. Venue properly lies with this Court pursuant to 7 U.S.C. §13a-1(e), because Defendant has an office in New York, New York, and at least some of the transactions, acts, practices, and courses of business alleged to have violated the Act and Regulations occurred, are occurring, and/or are about to occur within this District.

### III.   PARTIES

7.   Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder. The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

8.   Defendant **Deutsche Bank AG** is a German global banking and financial services company, headquartered in Frankfurt, Germany. Deutsche Bank operates in over seventy countries and has offices in major financial centers including Frankfurt, London, New York City, Tokyo, Singapore, and Hong Kong. Deutsche Bank has a large presence in the swaps markets and has been provisionally registered with the Commission as a swap dealer since December 31, 2012.

### IV.   FACTS

9.   To enhance transparency, promote standardization, and reduce systemic risk, Section 727 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title VII §727, 124 Stat. 1376 (enacted July 21, 2010), added a provision to the Act that requires all swaps to be reported to a registered swap data repository ("SDR") and establishes requirements for real-time reporting and public availability of swap transaction data. *See* 7 U.S.C. §§ 2(a)(13), 6r, 12a(5), and 24a (2012).

10.   Pursuant to these requirements, the Commission implemented Regulations under 17 C.F.R. pts. 43 and 45 (2016). Part 43 and Part 45 of the Regulations require reporting parties to timely and accurately report, among other things, the following: (1) messages that constitute

real-time, publicly reportable swap transactions ("real-time data");[1] (2) all required swap creation data ("creation data");[2] and (3) required swap continuation data ("continuation data").[3] One required data field in both creation and continuation data is the legal entity identifier ("LEI") field.[4] *See* 17 C.F.R. § 45.6. Reporting parties are also required to correct any errors in swap data that were previously reported to ensure that the information disseminated to the market and the Commission remains current and accurate. *See* 17 C.F.R. § 45.14(a). Additionally, Part 23 of the Regulations contains certain supervision directives for swap dealers, including the requirement to have a Business Continuity and Disaster Recovery Plan to be implemented in the event of a disruption of the swap dealer's normal business activities.

A. The CFTC Order Against Deutsche Bank

11. On September 30, 2015, the Commission issued an order instituting administrative proceedings pursuant to 7 U.S.C. §§ 9 and 13b (2012), and simultaneously accepted Deutsche Bank's Offer of Settlement ("CFTC Order"). *See* CFTC Dkt. No. 15-40.

---

[1] A "publicly reportable swap transaction" is defined as "(i) [a]ny executed swap that is an arm's-length transaction between two parties that results in a corresponding change in the market risk position between the two parties; or (ii) [a]ny termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights or obligations of a swap that changes the pricing of the swap." 17 C.F.R. § 43.2.

[2] The term "creation data" means "all primary economic terms data for a swap in the swap asset class in question, and all confirmation data for the swap." 17 C.F.R. § 45.1. The term "primary economic terms data" ("PET data") means "all of the data elements necessary to fully report all of the primary economic terms of a swap in the swap asset class of the swap in question," and includes legal entity identifiers ("LEIs"), among other fields. *Id*. The term "confirmation data" means "all the terms of a swap matched and agreed upon by the counterparties in confirming the swap." *Id*.

[3] The term "continuation data" means "all of the data elements that must be reported during the existence of a swap to ensure that all data concerning the swap in the [SDR] remains current and accurate, and includes all changes to the primary economic terms of the swap occurring during the existence of the swap." 17 C.F.R. § 45.1. Continuation data includes, but is not limited to, all "life cycle event data" for the swap. *Id*. "Life cycle event data" includes all the data elements necessary to fully report any "life cycle event." *Id*. "Life cycle events" include "any event that would result in either a change to a primary economic term of a swap or to any [PET] data previously reported to a[n] [SDR] in connection with a swap. Examples of such events include, without limitation,…[the] availability of a[n] [LEI] for a swap counterparty previously identified by name or by some other identifier…" *Id*.

[4] An LEI is a unique, 20-character, alpha-numeric code, used to uniquely identify legally distinct entities that act as counterparties to swap transactions, among other financial transactions. Valid LEIs are crucial to the Commission's assessment of systemic risk in the swaps markets because without LEIs, the Commission could not determine who was participating in each market, and each participant's level of risk.

4

12. As recited in the CFTC Order, the CFTC made findings of fact and conclusions of law that Deutsche Bank failed to accurately report swap cancellations in all asset classes[5] from January 2013 through July 2015. This resulted in between tens of thousands and hundreds of thousands of reporting violations in Deutsche Bank's swap data reporting during that time period.

13. Specifically, the CFTC Order found that Deutsche Bank (1) failed to report cancellations[6] in certain asset classes; (2) failed to investigate and correct errors in the cancellation messages that it did report; (3) misused cancellation messages for certain block trades; and (3) failed to notify the SDR and correct the errors and omissions within the time period prescribed by the Regulations. The CFTC Order also found that Deutsche Bank had technology-related issues, including problems determining whether a swap cancellation was in fact reportable. Consequently, both the public data available to market participants, and the data available to the Commission was incomplete and inaccurate, and thus not representative of Deutsche Bank's actual trading activity during that time period.

14. Deutsche Bank, represented by counsel, neither admitted nor denied the allegations and conclusions contained in the CFTC Order and consented to entry of the CFTC Order which required Deutsche Bank to (1) cease and desist from violating 17 C.F.R. Sections 43.3(a) and (e) (failure to properly report and correct errors in real-time data), 45.4(a) (failure to properly report continuation data), 45.14(a) (failure to correct errors and omissions in previously

---

[5] The term "asset class" refers to the "broad category of goods, services or commodities… with common characteristics underlying a swap. The asset classes include credit, equity, foreign exchange (excluding cross-currency), interest rates (including cross-currency), other commodity, and other such asset classes as may be determined by the Commission." 17 C.F.R. § 45.1. During the Relevant Period, Deutsche Bank transacted deals in swaps in each of these asset classes.

[6] Because the definition of a cancellation is an extinguishing of rights or obligations of a swap, cancellations fall under the definition of a "publicly reportable swap transaction" provided *supra*.

reported data), and 23.602 (supervision failures); (2) pay a $2,500,000 civil monetary penalty; and (3) engage in a series of conditions and undertakings to correct its swap reporting problems.

    **B. The System Outage**

15. On April 16, 2016, Deutsche Bank scheduled a series of updates on its regular swap data reporting platform ("Main Platform"). In order to run the updates, Deutsche Bank switched from the Main Platform to its backup platform, the Disaster Recovery Platform.

16. After switching to the Disaster Recovery Platform, Deutsche Bank discovered that certain files on that platform were corrupt. At that point, Deutsche Bank switched back to the Main Platform. However, the corrupted files transferred from the Disaster Recovery Platform to the Main Platform. As a result, the corrupted files shut down the reporting of messages for multiple asset classes from both the Main Platform and the Disaster Recovery Platform.

17. Not only was Deutsche Bank's Business Continuity and Disaster Recovery Plan ("Disaster Recovery Plan") and other supervisory systems unable to prevent the System Outage, but the same systems were also unable to resume Deutsche Bank's swap data reporting functions until on or about April 21, 2016.

18. In fact, Deutsche Bank could not implement the Disaster Recovery Plan at all in response to the System Outage because the first step in the Disaster Recovery Plan required switching from the Main Platform to the Disaster Recovery Platform, which housed the corrupt files, and initiated the failure.

    **C. The Recovery Efforts and Additional Reporting Failures**

19. From at least April 16, 2016 and continuing to the present (the "Relevant Period"), Deutsche Bank reported and continues to report incomplete and untimely swap data to the SDR for swaps in certain asset classes.

6


20. On or about April 21, 2016, Deutsche Bank resumed it swap data reporting. However, Deutsche Bank continued to create and discover new reporting problems, many of which occurred with messages reported for foreign exchange ("FX") swaps.

21. For example, Deutsche Bank's swap data reported before and after the System Outage revealed persistent problems with the integrity of certain data fields reported for "life cycle events," including numerous invalid LEIs. To date, Deutsche Bank has been unable to correct many of these errors.

22. In addition, on or about May 12, 2016, Deutsche Bank stopped reporting all real-time data for FX swaps for approximately 24 hours because one message became "stuck in the queue" and prevented all other messages from being processed. As a result at least 10,000 real-time FX swap messages were submitted late.

23. Also, on June 15, 2016, a scheduled IMM day,[7] real-time data reporting for FX swaps slowed dramatically as the result of an update to Deutsche Bank's swap data reporting platform that was installed in response to the System Outage. As a result, all real-time data for FX swaps was reported several hours late.

24. Then, on or about July 9, 2016, unbeknownst to relevant management, Deutsche Bank staff ran an update to the server it uses to report its FX messages to the SDR. To run this update, Deutsche Bank disconnected an essential computer connection, such that the server could not transmit any FX messages to the SDR. However, after the update was completed, the server was not reconnected. Although an error message was generated, this particular type of error message had not been preselected for managerial review, thus the error was instead automatically

---

[7] "IMM" stands for the International Monetary Market. There is one scheduled IMM date per quarter and many futures, options, and swaps use the IMM date as their scheduled maturity or termination date. As such, contracts are frequently rolled on IMM dates, resulting in these dates being among the highest volume trading days of the year.

overridden by Deutsche Bank's "system." Because of the failure to transmit FX messages to the SDR, Deutsche Bank staff subsequently observed what they (correctly) deemed to be unusually low volumes of reported messages. However, rather than report this anomaly to management or investigate its cause, Deutsche Bank staff simply assumed that it was a "slow week." Ultimately, the connectivity issue was discovered and corrected on or about July 14. However, to date, Deutsche Bank has failed to submit the messages that should have been submitted during the week of July 11.

25.     Further, as recently as August 2, 2016, Deutsche Bank has not reported tens of thousands of FX swap messages since the System Outage. This reporting failure is believed to be the result of an upgrade installed by Deutsche Bank in response to the System Outage.

26.     In fact, as of the date of this Complaint, large volumes of real-time data, that is made available to the public, as well as creation and continuation data made available to the Commission, continue to be reported late for certain asset classes during periods of high volume trading.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE:
### VIOLATION OF THE CFTC ORDER

27.     The allegations set forth in paragraphs 1 through 26 are re-alleged and incorporated herein by reference.

28.     The Commission is authorized to bring an injunctive action in district court when an entity "has engaged, is engaging, or is about the engage in any act or practice constituting a violation of any provision of [the] Act or any rule, regulation, or *order* thereunder…" 17 U.S.C. § 13a-1(a) (*emphasis added*).

29.     As stated *supra*, on September 30, 2015, the CFTC Order was issued pursuant to 7 U.S.C. §§ 9 and 13b. *See* CFTC No. 15-40.

30.     Section VII, Paragraph A of the CFTC Order directs Defendant to cease and desist from violating 17 C.F.R. §§ 43.3(a) and (e) (failure to properly report and correct errors in real-time data), 45.4(a) (failure to properly report continuation data), 45.14(a) (failure to correct errors and omissions in previously reported data) and 23.602 (supervision failures).

31.     Through the conduct alleged in Paragraphs 11-26, *supra,* Defendant violated 17 C.F.R. §§ 43.3(a), 45.4(a), 45.14(a), and 23.602, and thus Defendant violated Section VII, Paragraph A of the CFTC Order.

32.     Each act by Defendant in violation of the CFTC Order, including those specifically alleged herein, constitutes a separate and distinct violation of the CFTC Order.

**COUNT TWO:**
**FAILURE TO COMPLY WITH SWAP REPORTING REQUIREMENTS**
**Defendant's Violations of 7 U.S.C. §§ 2(a)(13)(F) and (G), and**
**17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii),**
**45.4(a), (c)(1)(i) and (c)(2)(i), and 45.6.**

33.     The allegations set forth in paragraphs 1 through 32 are re-alleged and incorporated herein by reference.

34.     The Act states that, with regard to real-time data, "[p]arties to a swap…shall be responsible for reporting swap transaction information to the appropriate registered entity in a timely manner as may be prescribed by the Commission." 7 U.S.C. § 2(a)(13)(F). The Act also requires that real-time data for each reportable swap (whether cleared[8] or uncleared) be reported to a registered SDR. *See* 7 U.S.C. § 2(a)(13)(G).

---

[8]     A "cleared swap" is defined as "any swap that is, directly or indirectly, submitted to and cleared by a derivatives clearing organization." 7 U.S.C. § 1a(7).

35. Specifically, Regulation 43.4 states that "[s]wap transaction and pricing information shall be reported to a registered [SDR] so that the [SDR] can publicly disseminate swap transaction and pricing data in real-time…" in the form and manner set forth in appendix A to Part 43. 17 C.F.R. § 43.4(a).

36. Further, "[a] reporting party shall report any publicly reportable swap transaction to a registered [SDR] as soon as technologically practicable[9] after such publicly reportable swap transaction is executed." 17 C.F.R. § 43.3(a)(1).

37. Regulation 45.3 sets forth the requirements for reporting creation data, including PET data and confirmation data. *See* 17 C.F.R. §§ 45.3(b)(1)(i) (off-facility,[10] cleared PET data), 45.3(c)(1)(i)(A) (off-facility, uncleared PET data), 45.3(b)(3)(i) (off-facility, cleared confirmation data), and 45.3(c)(1)(iii) (off-facility, uncleared confirmation data).

38. Regulation 45.4 requires registered entities and swap counterparties to report continuation data. *See* 17 C.F.R. § 45.4(a). Regulation 45.4(c) sets forth the specific requirements for reporting continuation data for uncleared swaps. *See* 17 C.F.R. §§ 45.4(c)(1)(i) (requirements for reporting life cycle event data, including LEIs, for uncleared swaps) and 45.4(c)(2)(i) (requirements for submitting end-of-day valuation data[11] for uncleared swaps).

39. Among other fields, reporting counterparties are required to report valid LEIs for each counterparty to a reportable swap transaction. *See* 17 C.F.R. § 45.1. In addition, Regulation

---

[9] The phrase "as soon as technologically practicable" means "as soon as possible, taking into consideration the prevalence, implementation, and use of technology by comparable market participants." 17 C.F.R. § 43.2. Moreover, in the preamble to Part 43, the Commission acknowledged that swap dealers are "more likely to have the infrastructure to report their swap transaction and pricing data to an SDR faster than other categories of market participants…" 77 Fed. Reg. 1182 (Jan. 9, 2012). Presently, provisionally registered swap dealers collectively submit more than two-thirds of their real-time data within five minutes of execution.

[10] An "off-facility swap" is defined as "any publicly reportable swap transaction that is not executed on or pursuant to the rules of a registered swap execution facility or designated contract market." 17 C.F.R. § 43.2.

[11] The term "valuation data" includes "all of the data elements necessary to fully describe the daily mark of the transaction, pursuant to [7 U.S.C. § 6s(h)(3)(B)(iii)], and to [17 C.F.R. § 23.431] of this chapter if applicable." 17 C.F.R. § 45.1.

45.6 states that "[e]ach counterparty to any swap subject to the jurisdiction of the Commission shall be identified in all recordkeeping and all swap data reporting pursuant to this part by means of a single [LEI]…" 17 C.F.R. § 45.6. Because LEIs are a form of PET data, all reporting parties are required to report the LEIs, among other fields, for the swap "as soon as technologically practicable after execution, but no later than 30 minutes after execution during the first year following the compliance date, and 15 minutes after execution thereafter." *See* 17 C.F.R. § 45.3(b)(1)(i).

40. As set forth above, Defendant failed to report *any* swap data for certain asset classes, including real-time data, creation data, and continuation data, to the SDR during the System Outage. In addition, data submitted prior to and after the System Outage reveals that certain required fields, including the LEI field, contain numerous invalid entries. Finally, much of the reported swap data was and continues to be submitted well outside the time constraints specified in the Regulations.

41. As a result, Defendant violated and continues to violate 7 U.S.C. §§ 2(a)(13)(F) and (G), and 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii), 45.4(a), (c)(1)(i) and (c)(2)(i), and 45.6.

42. Each message of reportable information that was either reported late, reported with invalid field entries, or not reported at all constitutes a separate and distinct violation by Defendant of 7 U.S.C. §§ 2(a)(13)(F) and (G), and 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii), 45.4(a), (c)(1)(i) and (c)(2)(i), and/or 45.6.

## COUNT THREE:
## FAILURE TO CORRECT ERRORS AND OMISSIONS
## IN PREVIOUSLY REPORTED SWAP DATA
### Defendant's Violation of 17 C.F.R. § 45.14(a)

43. The allegations set forth in paragraphs 1 through 42 are re-alleged and incorporated herein by reference.

44. Regulation 45.14(a) requires each reporting counterparty to report and correct errors or omissions in creation or continuation data as soon as technologically practicable after discovery of any such error or omission. *See* 17 C.F.R. § 45.14(a).

45. As set forth above, during the Relevant Period, Defendant failed to promptly correct its errors and omissions upon discovery in both its creation and continuation data in violation of 17 C.F.R. § 45.14(a). Specifically, before and after the System Outage, Defendant submitted creation and continuation data that included numerous errors and omissions, including, but not limited to, submissions with invalid LEIs. However, Defendant has not corrected many of these errors at all, let alone within the timeframe prescribed by the Regulations. As a result, Defendant has violated and continues to violate 17 C.F.R. § 45.14(a).

46. Each error or omission that was previously reported but either not corrected by Defendant at all, or not corrected within the timeframe required by the Regulations constitutes a separate and distinct violation of 17 C.F.R. § 45.14(a).

## COUNT FOUR:
## INADEQUATE BUSINESS CONTINUITY AND DISASTER RECOVERY PLAN
### Defendant's Violation of 17 C.F.R. § 23.603

47. The allegations set forth in paragraphs 1 through 46 are re-alleged and incorporated herein by reference.

48. Regulation 23.603 requires all swap dealers, among others, to "establish and maintain a written business continuity and disaster recovery plan that outlines the procedures to

be followed in the event of an emergency or other disruption of its normal business activities." 17 C.F.R. § 23.603(a). Among other things, the business continuity and disaster recovery plan must be designed to enable the swap dealer "to continue or resume any operations by the next business day with minimal disturbance to its counterparties and the market, and to recover all documentation and data required to be maintained by applicable law and regulation." *Id*.

49. As set forth above, Defendant could not even implement its Disaster Recovery Plan because the first step of the plan required enabling the disaster recovery platform where the System Outage was initiated. Accordingly, Defendant violated 17 C.F.R. § 23.603.

50. Each day that Defendant was unable to resume operations constitutes a separate and distinct violation of 17 C.F.R. § 23.603.

## COUNT FIVE:
## SUPERVISION FAILURES
### Defendant's Violations of 17 C.F.R. § 23.602

51. The allegations set forth in paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

52. Regulation 23.602 requires each swap dealer, among others, to "establish and maintain a system to supervise, and shall diligently supervise, all activities relating to its business performed by its partners, members, officers, employees, and agents (and persons occupying a similar status or performing a similar function)." 17 C.F.R. § 23.602(a).

53. The failures set forth *supra* occurred because Defendant failed to employ an adequate supervisory system to prevent and appropriately respond to the System Outage. Because of this lack of oversight, Defendant continues to fail to meet its reporting requirements under the Act and the Regulations. Accordingly, Defendant failed and continues to fail to perform its supervisory duties diligently in violation of 17 C.F.R. § 23.602.

54. Each violation by Defendant, as alleged above, constitutes a separate and distinct violation of 17 C.F.R. § 23.602.

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by 7 U.S.C. § 13a-l, and pursuant to its own equitable powers, enter:

a. An order appointing a monitor to ensure Defendant's compliance with its reporting responsibilities under the Act and Regulations. Specifically, the monitor will assess and make recommendations regarding Defendant's swap data reporting activities, including, but not limited to its policies, procedures, infrastructure, and systems;

b. An order finding that Defendant violated the CFTC Order;

c. An order finding that Defendant violated 7 U.S.C. §§ 2(a)(13)(F) and (G), and 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii), 45.4(a), (c)(1)(i) and (c)(2)(i), 45.6, 45.14(a), 23.602, and 23.603;

d. An order permanently enjoining Defendant from violating the CFTC Order;

e. An order permanently enjoining Defendant from violating 7 U.S.C. §§ 2(a)(13)(F) and (G), and 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii), 45.4(a), (c)(1)(i) and (c)(2)(i), 45.6, 45.14(a), 23.602, and 23.603;

f. An order directing Defendant to pay a civil monetary penalty for each violation of the Act and the Regulations described herein, plus post-judgment interest, in the amount of the higher of: 1) $140,000 for each violation of the Regulations; or 2) triple the monetary gain to Defendant for each violation of the Act and the Regulations, plus post-judgment interest;

  g. An order requiring Defendant to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

  h. Such other and further relief as the Court deems proper.


Dated: August 18, 2016    Respectfully Submitted,

            Attorneys for Plaintiff
            U.S. Commodity Futures Trading Commission

_____
Richard A. Glaser
Deputy Director
New York Bar No. 8652
*rglaser@cftc.gov*

Amanda L. Burks
Senior Trial Attorney
(*pro hac vice* admission pending)
*aburks@cftc.gov*

James H. Holl, III
Chief Trial Attorney
(*pro hac vice* admission pending)
*jholl@cftc.gov*

U.S. Commodity Futures Trading Commission
Division of Enforcement
Three Lafayette Centre
1155 21st Street NW
Washington, D.C. 20581
(202) 418-5000 (Main)
(202) 418-5358 (Glaser)
(202) 418-5968 (Burks)
(202) 418-5311 (Holl)