UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF NEW YORK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                    PLAINTIFF,

v.

DEUTSCHE BANK AG,

                    DEFENDANT.

NO. 1:16-CV-6544 (WHP)

## CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEUTSCHE BANK AG

### I.  INTRODUCTION

On August 18, 2016, Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendant Deutsche Bank AG ("Deutsche Bank" or "Defendant") seeking injunctive and other equitable relief, as well as the imposition of civil monetary penalties, alleging (1) violations of a prior CFTC Order ("CFTC Order"); and (2) new violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2012), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2016), relating to Deutsche Bank's failure to meet its responsibilities regarding swap data reporting, supervision, and its business continuity and disaster recovery plan. (Dkt. No. 1.) These charges stemmed from an unprecedented swap reporting platform outage at Deutsche Bank beginning on April 16, 2016, during which Deutsche Bank was unable to report any swap data for multiple asset classes for a period of five days ("System Outage"). *Id.* Deutsche Bank's efforts to end the System Outage exacerbated existing reporting problems and led to the creation of new reporting problems, many of which violated the CFTC Order. *Id.*

Because many of Deutsche Bank's reporting problems were ongoing when the Complaint was filed, the CFTC simultaneously sought—and Deutsche Bank consented to—the Court's appointment of an independent monitor to facilitate Deutsche Bank's compliance with its reporting responsibilities under the CFTC Order, the Act, and the Regulations. (Dkt. Nos. 4, 41.) On October 20, 2016, the Court issued a Consent Order of Preliminary Injunction and Other Relief against Deutsche Bank ("PI Order") and appointed Paul S. Atkins of Patomak Global Partners LLC as monitor ("Monitor" or "Monitorship"). (Dkt. Nos. 23-24.)

At the parties' request, over more than two years, the Court stayed Deutsche Bank's deadline to answer or otherwise respond to the Complaint while the Monitor continued his work. (Dkt. Nos. 22, 33, 36, 41, 45, 48, 51, 54, 56, 58, 61, 69, 74.) The Monitorship concluded on May 20, 2019 (Dkt. No. 67), and the Monitor submitted his final report on August 3, 2019. (Dkt. No. 72.) As of that date, the Monitor concluded that Deutsche Bank had addressed the Monitor's recommendations, both from technological and managerial standpoints.

On November 20, 2019, the parties notified the Court that they had reached a settlement in principle (Dkt. No. 77), and on [date] the CFTC submitted its Motion for the Entry of the Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Deutsche Bank AG and its Memorandum in Support Thereof ("Motion"). (Dkt. No. ##.)

## II.   CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Deutsche Bank without a trial on the merits or any further judicial proceedings, Deutsche Bank:

1.   Consents to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendant Deutsche Bank AG ("Consent Order");

2.     Affirms that it has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.     Acknowledges service of the summons and Complaint;

4.     Admits the jurisdiction of this Court over it and the subject matter of this action pursuant to 7 U.S.C. § 13a-1 (2018);

5.     Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6.     Admits that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.     Waives:

(a)     Any and all claims that it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2018) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2019), relating to, or arising from, this action;

(b)     Any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, Title II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

(c)     Any claim of double jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

3

(d)      Any and all rights of appeal from this action;

8.      Consents to the continued jurisdiction of this Court over it for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendant now or in the future resides outside the jurisdiction of this Court;

9.      Agrees that it will not oppose enforcement of this Consent Order on the grounds, if any exist, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon;

10.      Agrees that neither it nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect its: (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Defendant also agrees that it shall comply with the agreement in this paragraph, and shall undertake all reasonable steps necessary to ensure that all of its agents and/or employees under its authority or control understand and comply with this agreement;

11.      Consents to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, which it admits;

12.      Consents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission, or to which the Commission is a party or claimant and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

13.     Does not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party or claimant, other than a proceeding in bankruptcy or receivership, or a proceeding to enforce the terms of this Consent Order;

14.     Agrees to provide prompt notice to this Court and the Commission by certified mail, in the manner required by Paragraph 72 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against it, prior to Deutsche Bank satisfying its obligations to pay the civil monetary penalty required by Paragraphs 69 and 70 of Part V of this Consent Order, whether the bankruptcy proceeding is filed inside or outside the United States; and

15.     Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendant in any other proceeding.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief pursuant to 7 U.S.C. § 13a-1 (2018), as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.     Findings of Fact**

**1.     The Parties to this Consent Order**

16.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of

the Act and the Regulations promulgated thereunder. The CFTC maintains its principal office at

Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

17.     Defendant **Deutsche Bank AG** is a German global banking and financial services

company, headquartered in Frankfurt, Germany. Deutsche Bank operates in over seventy countries

and has offices in major financial centers including Frankfurt, London, New York City, Tokyo,

Singapore, and Hong Kong. Deutsche Bank has a large presence in the swaps markets and has

been provisionally registered with the CFTC as a swap dealer since December 31, 2012.

**2.      Background**

18.     To enhance transparency, promote standardization, and reduce systemic risk,

Section 727 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub.

L. No. 111-203, Title VII § 727, 124 Stat. 1376 (enacted July 21, 2010), added a provision to the

Act that requires all swaps to be reported to a registered swap data repository ("SDR") and

establishes requirements for real-time reporting and public availability of swap transaction data.

*See* 7 U.S.C. §§ 2(a)(13), 6r, 12a(5), 24a (2018).

19.     Pursuant to these requirements, the CFTC implemented Part 43 and Part 45 of the

Regulations, 17 C.F.R. pts. 43, 45 (2019), among others. These Parts require reporting parties to

timely and accurately report, among other things, the following: (1) messages that constitute real-

time, publicly reportable swap transactions ("real-time data");[1] (2) all required swap creation

data ("creation data");[2] and (3) required swap continuation data ("continuation data").[3] One

---

[1]      A "publicly reportable swap transaction" is defined as "(i) [a]ny executed swap that is an arm's-length transaction between two parties that results in a corresponding change in the market risk position between the two parties; or (ii) [a]ny termination, assignment, novation, exchange, transfer, amendment, conveyance, or extinguishing of rights or obligations of a swap that changes the pricing of the swap." 17 C.F.R. § 43.2 (2019).

[2]      The term "required swap creation data" means "all primary economic terms data for a swap in the swap asset class in question, and all confirmation data for the swap." 17 C.F.R. § 45.6 (2019). The term "primary economic terms data" ("PET data") means "all of the data elements necessary to fully report all of the primary economic terms of a swap in the swap asset class of the swap in question." *Id*. The term "confirmation data" means "all the terms of a swap matched and agreed upon by the counterparties in confirming the swap." *Id*.

required data field in both creation and continuation data is the legal entity identifier ("LEI") field.[44] *See* 17 C.F.R. § 45.6 (2019). Reporting parties are also required to correct any errors in swap data that were previously reported to ensure that the information disseminated to the market and the CFTC remains current and accurate. *See* 17 C.F.R. § 45.14(a) (2019). Additionally, Part 23 of the Regulations, 17 C.F.R. pt. 23 (2019), contains certain supervision directives for swap dealers, including the requirement to have a business continuity and disaster recovery plan to be implemented in the event of a disruption of the swap dealer's normal business activities.

### 3.    The CFTC Order Against Deutsche Bank

20.    On September 30, 2015, the CFTC issued an Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Deutsche Bank AG (defined above as the CFTC Order). *See In re Deutsche Bank AG*, CFTC No. 15-40, 2015 WL 5783049 (Sept. 30, 2015).

21.    As recited in the CFTC Order, the CFTC made findings of fact and conclusions of law, which Deutsche Bank neither admitted nor denied, that Deutsche Bank failed to accurately report swap cancellations in various asset classes[5] from January 2013 through July 2015. *Id*. at

---

3        The term "required swap continuation data" means "all of the data elements that must be reported during the existence of a swap to ensure that all data concerning the swap in the [SDR] remains current and accurate, and includes all changes to the primary economic terms of the swap occurring during the existence of the swap." 17 C.F.R. § 45.1. Continuation data includes, but is not limited to, all "life cycle event data" for the swap. *Id*. "Life cycle event data" includes "all the data elements necessary to fully report any life cycle event." *Id*. "Life cycle events" include "any event that would result in either a change to a primary economic term of a swap or to any [PET] data previously reported to a[n] [SDR] in connection with a swap. Examples of such events include, without limitation, . . . [the] availability of a[n] [LEI] for a swap counterparty previously identified by name or by some other identifier . . . ." *Id*.

4        An LEI is a unique, twenty-character, alpha-numeric code, used to uniquely identify legally distinct entities that act as counterparties to swap transactions, among other financial transactions. Valid LEIs are crucial to the Commission's assessment of systemic risk in the swaps markets because without LEIs, the Commission could not determine who was participating in each market, and each participant's level of risk.

5        The term "asset class" refers to the "broad category of goods, services or commodities... with common characteristics underlying a swap. The asset classes include credit, equity, foreign exchange (excluding cross-currency), interest rates (including cross-currency), other commodity, and other such asset classes as may be

*3-4. This resulted in between tens of thousands and hundreds of thousands of reporting violations in Deutsche Bank's swap data reporting during that time period. *Id.*

22.      Specifically, the CFTC Order found that Deutsche Bank (1) failed to report cancellations[6] in certain asset classes; (2) failed to investigate and correct errors in the cancellation messages that it did report; (3) misused cancellation messages for certain block trades; and (4) failed to notify the SDR and correct the errors and omissions within the time period prescribed by the Regulations. *Id.* at *3-5. The CFTC Order also found that Deutsche Bank experienced technology-related issues, including problems determining whether a swap cancellation was reportable at all. *Id.* at *4. Consequently, both the real-time data available to market participants, and the creation and continuation data available to the CFTC, was incomplete and inaccurate, and thus not representative of Deutsche Bank's actual trading activity during that time period. *Id.*

23.      Deutsche Bank consented to entry of the CFTC Order, which required Deutsche Bank to: (1) cease and desist from violating 17 C.F.R. 43.3(a) and (e), 17 C.F.R. § 43.3(a), (e) (2014), (failure to properly report and correct errors in real-time data), 45.4(a), 17 C.F.R. § 45.4(a) (2014), (failure to properly report continuation data), 45.14(a), 17 C.F.R. § 45.14(a) (2014), (failure to correct errors and omissions in previously reported data), and 23.602, 17 C.F.R. § 23.602 (2014), (supervision failures); (2) pay a $2,500,000 civil monetary penalty; and (3) represent that it corrected its swap reporting problems. The CFTC Order provided an 18-month period for Deutsche Bank to complete seven remedial undertakings.

---

determined by the Commission." 17 C.F.R. § 45.1. Before, during, and after the System Outage, Deutsche Bank transacted in swaps in each of these asset classes.

[6]      Because the definition of a cancellation is an extinguishing of rights or obligations of a swap, cancellations fall under the definition of a "publicly reportable swap transaction" provided *supra*.

**4.      The System Outage**

24.      On April 16, 2016, Deutsche Bank scheduled a maintenance upgrade to its regular swap data reporting platform ("Main Platform") to add additional capacity to the database used for CFTC swap data reporting. In order to perform the upgrade, Deutsche Bank switched from its Main Platform to its backup platform (the "Disaster Recovery Platform").

25.      After switching to its Disaster Recovery Platform, Deutsche Bank discovered that certain files on this platform were corrupt. At that point, Deutsche Bank switched back to the Main Platform. In the process, however, Deutsche Bank inadvertently transferred the corrupted files from the Disaster Recovery Platform to the Main Platform. The corrupted files on the Main Platform caused the entire swap data reporting system at Deutsche Bank to shut down. The exercise to repair the Main Platform was complex and resulted in Deutsche Bank being unable to report any swap data, including all real-time data, creation data, and continuation data, to the SDR for approximately five days.

26.      Simply put, Deutsche Bank's business continuity and disaster recovery plan ("Disaster Recovery Plan") was unable to prevent the System Outage and unable to resume Deutsche Bank's swap data reporting functions until on or about April 21, 2016.

27.      In fact, Deutsche Bank could not execute the Disaster Recovery Plan at all in response to the System Outage because the first step in the Disaster Recovery Plan required switching from the Main Platform to the Disaster Recovery Platform which initially housed the corrupt files and initiated the System Outage.

28.      The deficiencies of the Disaster Recovery Plan, as described in Paragraphs 24-27, represent a failure by Deutsche Bank to supervise its swaps data reporting system.

**5.      The Recovery Efforts and Additional Reporting Failures**

29.     In addition to the System Outage described above, from at least April 21, 2016,

until the Complaint was filed, Deutsche Bank reported incomplete and untimely swap data to the

SDR for swaps in certain asset classes.

30.     For example, on or about April 21, 2016, Deutsche Bank resumed its swap data

reporting. However, Deutsche Bank continued to inadvertently create and discover new

reporting problems, many of which occurred with real-time data, creation data, and

continuation data reported for foreign exchange ("FX") swaps.

31.     On or about May 12, 2016, Deutsche Bank stopped reporting all real-time data for

FX swaps for approximately twenty-four hours because an error in the system caused message

processing to stop on a particular message and prevented all subsequent messages from being

processed. As a result, at least 10,000 FX swap messages, including ones with real-time data,

were submitted late.

32.     Then, on June 15, 2016, a scheduled IMM day,[7] real-time data reporting for FX

swaps slowed dramatically as the result of an update to Deutsche Bank's swap data reporting

platform that Deutsche Bank installed in response to the System Outage. As a result, all

Deutsche Bank's real-time data for FX swaps was reported several hours late.

33.     On or about July 9, 2016, Deutsche Bank's supervisory systems failed once again

when Deutsche Bank staff ran an update to the server used to report its FX messages to the SDR.

To run this update, Deutsche Bank disconnected an essential computer connection, such that the

server could not transmit any FX message data (real-time data, creation data, or continuation

---

[7]      "IMM" stands for the International Monetary Market. There is one scheduled IMM date per quarter and many futures, options, and swaps use the IMM date as the scheduled maturity or termination date. As such, contracts are frequently "rolled" on IMM dates—meaning the maturity or termination date of a position is extended by closing the initial contract and opening a new longer-term contract for the same underlying asset at the then-current market price—resulting in these dates being among the highest volume trading days of the year.

data) to the SDR. However, after the update was completed, Deutsche Bank failed to reconnect

the server. Although an error message was generated, Deutsche Bank had not preselected this

particular type of error message for managerial review, and, as a result, no one at Deutsche Bank

was notified of the error. Instead, Deutsche Bank's system automatically overrode this error,

effectively ignoring the disconnected server. Because of the failure to transmit FX messages to

the SDR, Deutsche Bank staff subsequently observed what they (correctly) deemed to be

unusually low volumes of reported messages. However, rather than report this anomaly to

management or investigate its cause, Deutsche Bank staff assumed that it was due to lower than

average volumes. Ultimately, the connectivity issue was discovered and corrected on or about

July 14, 2016. However, these omitted FX messages were not reported until after the Complaint

was filed.

34.     In addition, Deutsche Bank's swap data reported before and after the System

Outage revealed recurring problems with the integrity of certain creation and continuation data

fields reported for "life cycle events," including numerous invalid LEIs. Many of these errors had

not been corrected at the time the Complaint was filed.

**6.      The Monitorship and Deutsche Bank's Remediation**

35.     Given the breadth of the failures regrading Deutsche Bank's swap data

reporting, supervision, and Disaster Recovery Plan, the CFTC requested, and Deutsche Bank

consented to, the entry of the PI Order, seeking the appointment of a monitor to facilitate

Deutsche Bank's compliance with its swap data reporting obligations. (Dkt. Nos. 4, 4-1.)

36.     On September 22, 2016, the Court ordered the CFTC to provide support for the

Preliminary Consent Order (Dkt. No. 10), and, on September 30, 2016, the CFTC submitted its

Memorandum of Points and Authorities in Support of its Notice of Motion for Entry of the

Proposed Consent Order, Preliminary Injunction, and Other Equitable Relief. (Dkt. No. 15.)

37.     On October 20, 2016, the Court issued the PI Order and appointed Paul S. Atkins of Patomak Global Partners LLP as Monitor. (Dkt. Nos. 23-24.)

38.     Over the course of the Monitorship, Deutsche Bank experienced additional isolated swap data reporting issues that it reported to, and addressed promptly with the assistance of, the Monitor.

39.     The Monitor observed that Deutsche Bank was in the process of implementing a control framework to address limitations in its swap reporting supervisory systems, including the appropriate escalation procedures. The Monitor made fifteen recommendations—which Deutsche Bank implemented—to remediate Deutsche Bank's swap data reporting and supervisory issues.

40.     In addition, the Monitor made seven recommendations—which Deutsche Bank implemented—to remediate issues involving the Disaster Recovery Plan at Deutsche Bank.

41.     The Monitor submitted seven quarterly reports to the Court regarding the progress at Deutsche Bank. (Dkt. Nos. 31, 39, 43, 46, 49, 52, 59.)

42.     On May 23, 2019, the Monitorship concluded, and, on August 3, 2019, the Monitor submitted its final report to the Court, which detailed the completion of its work at Deutsche Bank. (Dkt. No. 72.) Indeed, the Monitor concluded that Deutsche Bank had addressed all of the Monitor's recommendations, both from technological and managerial standpoints.

43.     In collaboration with the Monitor, CFTC staff, and the SDR, Deutsche Bank made great strides in correcting errors and omissions in previously reported swaps. Indeed, Deutsche Bank represents that it has backreported all of the new swaps entered during the System Outage that were not initially reported under both Parts 43 and 45 of the Regulations.

44.     As of September 2019, Deutsche Bank has also backreported tens of thousands of historic or "dead" swaps that had been previously omitted due to errors in its swap data reporting systems.

**B.     Conclusions of Law**

**1.     Jurisdiction and Venue**

45.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2012) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), provides that the Commission may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

46.     Venue properly lies with this Court pursuant to 7 U.S.C. §13a-1(e), because Defendant has an office in New York, New York, and at least some of the transactions, acts, practices, and courses of business alleged to have violated the Act and Regulations occurred within this District.

**2.     Violation of the CFTC Order**

47.     As stated *supra*, on September 30, 2015, the CFTC Order was issued pursuant to 7 U.S.C. §§ 9 and 13b. *See Deutsche Bank*, 2015 WL 5783049. The CFTC Order provided an 18-month period for Deutsche Bank to complete seven remedial undertakings.

48.     Section VII, Paragraph A of the CFTC Order directed Deutsche Bank to cease and desist from violating 17 C.F.R. §§ 43.3(a) and (e) (failure to properly report and correct errors in

real-time data), 45.4(a) (failure to properly report continuation data), 45.14(a) (failure to correct

errors and omissions in previously reported data), and 23.602 (supervision failures). *Id*. at \*6.

49.     Through the conduct described *supra,* Defendant inadvertently violated 17

C.F.R. §§ 43.3(a) and 45.4(a). In addition, Defendant violated 17 C.F.R. § 23.602. Thus,

Defendant violated Section VII, Paragraph A of the CFTC Order.

### 3.     Failure To Comply with Swap Data Reporting Requirements

50.     The Act states that, with regard to real-time data, "[p]arties to a swap...shall be

responsible for reporting swap transaction information to the appropriate registered entity in a

timely manner as may be prescribed by the Commission." 7 U.S.C. § 2(a)(13)(F). The Act also

requires that real-time data for each reportable swap (whether cleared[8] or uncleared) be reported

to a registered SDR. *See* 7 U.S.C. § 2(a)(13)(G).

51.     Specifically, 17 C.F.R. § 43.4(a) states that "[s]wap transaction and pricing

information shall be reported to a registered [SDR] so that the [SDR] can publicly disseminate

swap transaction and pricing data in real-time" in the form and manner set forth in appendix A

to Part 43.

52.     Further, "[a] reporting party shall report any publicly reportable swap transaction

to a registered [SDR] as soon as technologically practicable[9] after such publicly reportable swap

transaction is executed." 17 C.F.R. § 43.3(a)(1).

---

[8]     A "cleared swap" is defined as "any swap that is, directly or indirectly, submitted to and cleared by a
derivatives clearing organization." 7 U.S.C. § 1a(7) (2018).

[9]     The phrase "as soon as technologically practicable" means "as soon as possible, taking into consideration
the prevalence, implementation, and use of technology by comparable market participants." 17 C.F.R. § 43.2.
Moreover, in the preamble to Part 43, the Commission acknowledged that swap dealers are "more likely to have the
infrastructure to report their swap transaction and pricing data to an SDR faster than other categories of market
participants." 77 Fed. Reg. 1182 (Jan. 9, 2012). Presently, provisionally registered swap dealers collectively submit
more than two-thirds of their real-time data within five minutes of execution.

53.     17 C.F.R. § 45.3 sets forth the requirements for reporting creation data, including primary economic terms (PET) data and confirmation data. *See* 17 C.F.R. §§ 45.3(b)(1)(i) (2016) (off-facility,[10] cleared PET data), 45.3(c)(1)(i)(A) (2016) (off-facility, uncleared PET data), 45.3(b)(3)(i) (2016) (off-facility, cleared confirmation data), 45.3(c)(1)(iii) (2016) (off-facility, uncleared confirmation data).[11]

54.     17 C.F.R. § 45.4(a) requires registered entities and swap counterparties to report continuation data. At the time the Complaint was filed 17 C.F.R. § 45.4(c) set forth the specific requirements for reporting continuation data for uncleared swaps. *See* 17 C.F.R. §§ 45.4(c)(1)(i) (2016) (requirements for reporting life cycle event data, including LEIs, for uncleared swaps),[12] 45.4(c)(2)(i) (2016) (requirements for submitting end-of-day valuation data[13] for uncleared swaps).[14]

55.     Among other fields, reporting counterparties are required to report valid LEIs for each counterparty to a reportable swap transaction. *See* 17 C.F.R. § 45.6. In addition, 17 C.F.R. § 45.6 states that "[e]ach counterparty to any swap subject to the jurisdiction of the Commission shall be identified in all recordkeeping and all swap data reporting pursuant to this part by means of a single [LEI]." Because LEIs are a form of PET data, all reporting parties are required to

---

[10]     An "off-facility swap" is defined as "any publicly reportable swap transaction that is not executed on or pursuant to the rules of a registered swap execution facility or designated contract market." 17 C.F.R. § 43.2.

[11]     Note that these subsections of the Regulations were in effect at the time the Complaint was filed. However, in 2016, Part 45 was amended.  *See Amendments to Swap Data Recordkeeping and Reporting Requirements for Cleared Swaps; Final Rule* ("2016 Amendments"), 85 Fed. Reg. 21578, 41747 (enacted June 27, 2016, effective Dec. 27, 2016).  Importantly, even though many of the Part 45 citations in the Complaint were changed in the 2016 Amendments, all of the substantive requirements remain the same.  For example, the subsections of Regulation 45.3 cited above are now housed in Regulation 45.3(b)(1)(i) and (c), 17 C.F.R. §§ 45.3(b)(1)(i), (c) (2019).

[12]     The 2016 Amendments moved the requirement to report life cycle event data from 17 C.F.R. § 45.4(c)(1)(i) to 17 C.F.R. § 45.4(d)(1)(i) (2019).

[13]     The term "valuation data" includes "all of the data elements necessary to fully describe the daily mark of the transaction, pursuant to [7 U.S.C. § 6s(h)(3)(B)(iii)], and to [17 C.F.R. § 23.431] of this chapter if applicable." 17 C.F.R. § 45.1.

[14]     The 2016 Amendments moved the requirement to report end-of-day valuation data from 17 C.F.R. § 45.4(c)(2)(i) to 17 C.F.R. § 45.4(d)(2)(i) (2019).

report the LEIs, among other fields, for the swap "as soon as technologically practicable after execution, but no later than thirty minutes after execution during the first year following the compliance date, and 15 minutes after execution thereafter." *See* 17 C.F.R. § 45.3(b)(1)(i) (2016).[15]

56.     The accuracy and completeness of swap reporting are critical to the Commission's mission to protect market participants and to ensure market integrity. *See, e.g.*, *In re Société Générale Int'l Ltd.*, CFTC No. 19-38, 2019 WL 4915485, at *6 (Sept. 30, 2019) (consent order) (collecting cases). Market participants rely upon the public availability of swaps data for price discovery purposes. *Id*. The Commission, in turn, requires complete and accurate reporting data to engage in meaningful oversight of the swaps market. *Id*.

57.     As set forth above, Defendant failed to report *any* swap data for certain asset classes, including real-time data, creation data, and continuation data, to the SDR during the System Outage. In addition, much of the reported swap data submitted prior to and after the System Outage was submitted well outside the time constraints specified in the Regulations. Finally, creation data and continuation data submitted prior to and after the System Outage reveals that certain required fields, including the LEI field, contained numerous invalid entries.

58.     As a result, Defendant violated 7 U.S.C. §§ 2(a)(13)(F) and (G), and 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (b)(3)(i), (c)(1)(i)(A), and (c)(1)(iii), 45.4(a), (c)(1)(i) and (c)(2)(i), and 45.6.

**4.     Failure To Correct Errors and Omissions in Previously Reported Swap Data**

59.     17 C.F.R. § 45.14(a) requires each reporting counterparty to report and correct errors or omissions in creation or continuation data as soon as technologically practicable after

---

[15]     The 2016 Amendments streamlined this Regulation to require swap dealers to report LEIs "as soon as technologically practicable after execution, but no later than 15 minutes after execution." 17 C.F.R. § 45.3(b)(1)(i) (2019).

discovery of any such error or omission. As set forth above, Defendant failed to promptly correct its errors and omissions upon discovery in both its reported creation and continuation data in violation of 17 C.F.R. § 45.14(a). Specifically, before and after the System Outage, Defendant submitted creation and continuation data that included numerous errors and omissions, including, but not limited to, submissions with invalid LEIs. Defendant failed to promptly correct these errors and omissions upon discovery and, as a result, violated 17 C.F.R. § 45.14(a).

<strong>5.      Inadequate Business Continuity and Disaster Recovery Plan</strong>

60.      17 C.F.R. § 23.603(a) requires all swap dealers, among others, to "establish and maintain a written business continuity and disaster recovery plan that outlines the procedures to be followed in the event of an emergency or other disruption of its normal business activities." Among other things, the business continuity and disaster recovery plan must be designed to enable the swap dealer "to continue or to resume any operations by the next business day with minimal disturbance to its counterparties and the market, and to recover all documentation and data required to be maintained by applicable law and regulation." *Id*.

61.      As set forth above, Defendant's Disaster Recovery Plan failed because it did not enable Defendant to resume its swap data reporting function the next business day, as required by 17 C.F.R. § 23.603(a), since the System Outage continued for five days.

62.      In fact, Defendant could not execute the Disaster Recovery Plan at all in response to the System Outage because the first step in the Disaster Recovery Plan required switching from the Main Platform to the Disaster Recovery Platform, which housed the corrupt files and initiated the System Outage.

63.      Accordingly, Defendant violated 17 C.F.R. § 23.603.

**6.      Supervision Failures**

64.      17 C.F.R. § 23.602(a) requires each swap dealer, among others, to "establish and maintain a system to supervise, and shall diligently supervise, all activities relating to its business performed by its partners, members, officers, employees, and agents (and persons occupying a similar status or performing a similar function)." 17 C.F.R. § 23.602 "relates generally to the supervision necessary to achieve compliance with the [Act] and [Regulations] by the registrant." Swap Dealer and Major Swap Participant Recordkeeping, Reporting, and Duties Rules; Futures Commission Merchant and Introducing Broker Conflicts of Interest Rules; and Chief Compliance Officer Rules for Swap Dealers, Major Swap Participants, and Futures Commission Merchants, 77 Fed. Reg. 20,128, 20,143 (Apr. 3, 2012). As such, a swap dealer is required to supervise its swap data reporting systems to ensure the accuracy, completeness, and timeliness of its swap data as required by the Act and Regulations. *See, e.g.*, *Société Générale Int'l Ltd.*, 2019 WL 4915485, at *7-8; *In re Northern Trust Co.*, CFTC No. 19-39, 2019 WL 4915486, at *4 (Sept. 30, 2019) (consent order); *In re Citibank, N.A.*, CFTC No. 17-26, 2017 WL 4280594, at *4 (Sept. 25, 2017) (consent order).

65.      Under 17 C.F.R. § 23.602, a violation is demonstrated by showing either that: (1) the registrant's supervisory system was generally inadequate; or (2) the registrant failed to perform its supervisory duties diligently. *See Société Générale Int'l Ltd.*, 2019 WL 4915485, at *7 (citing *In re Commerzbank AG*, CFTC No. 19-03, 2018 WL 5921385, at *10-11 (Nov. 8, 2018) (consent order)); *In re INTL FCStone Mkts., LLC*, CFTC No. 15-27, 2015 WL 4980321, at *3 (Aug. 19, 2015) (consent order) (interpreting Regulation 23.602 and noting its similarity to Regulation 166.3, 17 C.F.R. § 166.3, making case law concerning Regulation 166.3 instructive); *cf. In re Murlas Commodities, Inc.*, CFTC No. 85-29, 1995 WL 523563, at *9 (Sept. 1, 1995)

(consent order) (interpreting Regulation 166.3)). Evidence of violations that "'should be detected by a diligent system of supervision, either because of the nature of the violations or because the violations have occurred repeatedly' is probative of a failure to supervise." *INTL FCStone Mkts.*, 2015 WL 4980321, at *3 (quoting *In re Paragon Futures Ass'n*, CFTC No. 8818, 1992 WL 74261, at *14 (Apr. 1, 1992)).

66. Before, during, and after the System Outage, Defendant failed to diligently supervise activities relating to its swap reporting responsibilities because it lacked the appropriate, streamlined oversight and escalation procedures to monitor its swap data reporting systems. Defendant's supervisory system should have also recognized many of the problems, later identified by the Monitor, regarding the Disaster Recovery Plan. Had Defendant had more robust supervisory procedures in place, the System Outage might not have occurred. Also, Defendant's supervisory system should have promptly noticed the swap data that was inaccurate, omitted, and/or submitted in an untimely manner, before and after the System Outage. Finally, if Defendant had a streamlined escalation procedure in place to address swap data reporting issues, it would have been notified of other swap data reporting issues, such as when the server was left disconnected on July 9, 2016, discussed *supra*. Because of this lack of diligent compliance, Defendant failed to meet its reporting requirements under the CFTC Order, the Act, and the Regulations. Accordingly, Defendant failed to perform its supervisory duties diligently in violation of 17 C.F.R. § 23.602.

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

67. Pursuant to Section 6c(c) of the Act, 7 U.S.C. § 13a-1(c) (2018), Defendant shall comply with the order issued by the Commission in *In re Deutsche Bank AG*, CFTC No. 15-40,

2015 WL 5783049 (Sept. 30, 2015), by correctly reporting Defendant's cancelled trades, correcting errors and omissions in previously reported swap data, and appropriately supervising its swap data processes.

68.     Pursuant to 7 U.S.C. § 13a-1(a), Defendant is permanently restrained and enjoined from violating:

        a.      Section 2(a)(13)(F) and (G) of the Act, 7 U.S.C. §§ 2(a)(13)(F), (G) (2018), and Regulations 43.3(a), 43.4(a), 45.3(b)(1)(i) and (c), 45.4(a), and 45.4(d)(1)(i) and (d)(2)(i), 17 C.F.R. §§ 43.3(a), 43.4(a), 45.3(b)(1)(i), (c), 45.4(a), and 45.4(d)(1)(i), (2)(i) (2019), by failing to comply with the swap data reporting requirements;

        b.      Regulation 45.6, 17 C.F.R. § 45.6 (2019), by failing to report swap data with valid legal entity identifiers;

        c.      Regulation 45.14(a), 17 C.F.R. § 45.14(a) (2019), by failing to correct errors and omissions in previously reported swap data;

        d.      Regulation 23.602, 17 C.F.R. § 23.602 (2019), by failing to supervise its swap data reporting processes; and

        e.      Regulation 23.603, 17 C.F.R. 23.603 (2019), by failing to have an adequate business continuity disaster recovery plan.

## V.     CIVIL MONETARY PENALTY

**IT IS FURTHER ORDERED THAT:**

69.     Pursuant to Section 6c(d) of the Act, 7 U.S.C. § 13a-1(d) (2018), Defendant shall pay a civil monetary penalty in the amount of nine million dollars ($9,000,000.00) ("CMP Obligation"), within thirty days of the date of the entry of this Consent Order. The parties acknowledge that the CMP Obligation represents a substantial reduction on account of Deutsche

Bank's cooperation with Commission staff during its investigation, as described above, and

Deutsche Bank's consent to the Court's appointment of an independent monitor to facilitate its

compliance with its obligations regarding swap data reporting, supervision, and its business

continuity and disaster recovery plan. If the CMP Obligation is not paid in full within thirty days

of the date of entry of this Consent Order, then post-judgment interest shall accrue on the CMP

Obligation beginning on the date of entry of this Consent Order and shall be determined by

using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28

U.S.C. § 1961 (2012).

70.     Defendant shall pay its CMP Obligation and any post-judgment interest by

electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank

money order. If payment is to be made other than by electronic funds transfer, then the payment

shall be made payable to the Commodity Futures Trading Commission and sent to the address

below:

> MMAC/ESC/AMK326
> Commodity Futures Trading Commission
> Division of Enforcement
> 6500 S. MacArthur Blvd.
> HQ Room 181
> Oklahoma City, OK 73169
> (405) 954-6569 office
> (405) 954-1620 fax
> 9-AMC-AR-CFTC@faa.gov

If payment by electronic funds transfer is chosen, Defendant shall contact Marie Thorne or her

successor at the address above to receive payment instructions and shall fully comply with those

instructions. Defendant shall accompany payment of the CMP Obligation with a cover letter that

identifies Defendant and the name and docket number of this proceeding. Defendant shall

simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial

Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street,

NW, Washington, D.C. 20581.

71.     Partial Satisfaction: Acceptance by the Commission of any partial payment of

Defendant's CMP Obligation shall not be deemed a waiver of its obligation to make further

payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to

compel payment of any remaining balance.

## VI.     MISCELLANEOUS PROVISIONS

72.     Notice: All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Rick Glaser
> U.S. Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street, NW
> Washington, D.C. 20581

Notice to Defendant:

> Deutsche Bank AG
> c/o David Meister
> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, NY 10036

All such notices to the Commission shall reference the name and docket number of this action.

73.     Change of Address/Phone: Until such time as Defendant satisfies in full its CMP

Obligation as set forth in this Consent Order, Defendant shall provide written notice to the

Commission by certified mail of any change to its telephone number and mailing address within

ten calendar days of the change.

74.     Entire Agreement and Amendments: This Consent Order incorporates all of the

terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to

amend or modify this Consent Order in any respect whatsoever, unless such amendment or modification is: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

75. Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

76. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action for the purpose of enforcing the terms of this Consent Order and for all other purposes related to this action, including any motion by Defendant to modify or for relief from the terms of this Consent Order.

77. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendant, upon any person under its authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, email, facsimile, or otherwise insofar as he or she is acting in active concert or participation with Defendant.

78. Authority: Karen Kuder and Thorsten Seyfried hereby warrant that they are the general counsel of Deutsche Bank, and that this Consent Order has been duly authorized by Deutsche Bank and they have been duly empowered to sign and submit this Consent Order on behalf of Deutsche Bank.

79. Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, email, or otherwise) to the other party, it being understood

that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

80.     Contempt: Defendant understands that the Commission may enforce the terms of the Consent Order, including the Permanent Injunction and Civil Monetary Penalty, through contempt proceedings, and that, in any such proceedings Defendant may not challenge the validity of this Consent Order.

81.     Agreements and Undertakings: Defendant shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Deutsche Bank AG forthwith and without further notice.

**IT IS SO ORDERED** on this ___17__ day of _____June_____ , 2020.

_____
WILLIAM H. PAULEY III
U.S.D.J.

CONSENTED TO AND APPROVED BY:



Karen Kuder
Digital unterschrieben von
Karen Kuder
Datum: 2020.05.22
18:55:28 +02'00'

_____
Karen Kuder
General Counsel
Deutsche Bank AG

Date: _5/22/20_____


Thorsten
Seyfried
Digital unterschrieben von
Thorsten Seyfried
Datum: 2020.05.22
18:06:34 +02'00'

_____
Thorsten Seyfried
General Counsel – Germany and EMEA
Deutsche Bank AG

Date: _5/22/20_____

_____
Richard A. Glaser
Deputy Director
Division of Enforcement
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
(202) 418-5358
rglaser@cftc.gov

Date: ___06/12/20_____


Approved as to form:

 /s/ David Meister
_____
David Meister
Attorney for Deutsche Bank AG

25